UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


DEVELOPERS SURETY AND
INDEMNITY COMPANY                                                                          PLAINTIFF


v.                                                                      NO. 3:11-CV-00090-CRS-JDM


RENAISSANCE VALLEY FARMS, LLC et al.                         DEFENDANTS


**MEMORANDUM OPINION**

This action was initially brought to enforce a surety bond issued by the plaintiff, Developers Surety and Indemnity Company ("Developers"), to Cooper Farms, LLC, for the purpose of establishing infrastructure improvements to the Cooper Farms subdivision located in Jefferson County, Kentucky. Although the claims between the initial parties have been settled, various third-party claims remain.

**I.**

The present litigation stems from a Third-Party Complaint filed in this action by defendants/third-party plaintiffs DKCD, Inc., Cooper Farms, LLC, Donald J. Cook, and Deborah S. Cook (collectively, "Plaintiffs"), asserting claims against third-party defendant Ball Homes, LLC ("Ball Homes"). (Third-Party Compl., DN 18). The claims in this action derive from a Purchase Agreement entered into between Plaintiffs[1] and Ball Homes, effective November 9,

---

[1] Although Cooper Farms, LLC and Ball Homes were the signatories to the Purchase Agreement, it is undisputed that Cooper Farms, LLC is an entity owned by DKCD, Inc., and both entities are controlled by Donald J. Cook.

2004, which contemplated Ball Homes' purchase of certain developed and undeveloped property in the Cooper Farms subdivision.[2]

There are three motions pending before the court, each involving discrete disputes that require the court to interpret and apply the provisions of the Purchase Agreement. These disputes center on whether: (1) Ball Homes breached the Purchase Agreement when it refused to purchase certain undeveloped property in Cooper Farms; (2) Ball Homes is required to indemnify Plaintiffs for the cost of repairs to certain infrastructure improvements in Cooper Farms; and (3) Plaintiffs had a duty to notify Ball Homes of an existing easement on certain property purchased by Ball Homes.

**1. The purchase of certain undeveloped property in Cooper Farms**

We will first address the facts relevant to the issue of whether Ball Homes was contractually obligated to purchase certain undeveloped property in Cooper Farms.

Plaintiffs owned and/or had the rights to purchase land in Cooper Farms. Some of this land was in an undeveloped, natural state, while other portions had been developed by Plaintiffs into subdivided lots, awaiting the construction of homes on the lots. In 2004, Plaintiffs decided to sell their remaining interest in Cooper Farms to Ball Homes, and they memorialized this transaction in the Purchase Agreement. (DN 24-3).

Due to the amount of land being sold, the Purchase Agreement expressly contemplated that the sale to Ball Homes would progress in several stages or phases. The Purchase Agreement gave Ball Homes "the exclusive right to purchase the 'Initial Property,' . . . and the exclusive right to purchase the 'Remainder Property" in return for Ball Homes' payment of a "Deposit Payment" of ten thousand dollars. (*Id.* § 1). The "Initial Property" consisted of 140 subdivided

---

[2] For the purposes of this Memorandum Opinion, any reference to "Cooper Farms" is intended to refer to the Cooper Farms subdivision, rather than Cooper Farms, LLC, a third-party plaintiff in this action.

lots located in Sections 1, 3, 5, 6, and 7 of Cooper Farms. (*Id.* § 2). The Purchase Agreement further defined the "Remainder Property" as all remaining land in Cooper Farms in which Plaintiffs had an interest. (*Id.* § 3). It also established the dates on which Ball Homes would close on the Remainder Property, with the closings set to occur in five separate phases (entitled "Second Closing," "Third Closing," "Fourth Closing," "Fifth Closing," and "Final Closing").

The parties completed the sale of the Initial Property, as well as the portions of the Remainder Property which were sold in the Second and Third Closings. However, a problem arose in relation to the property contemplated for the Fourth Closing (the "Undeveloped Property"). This property was unplatted, but it could be divided into no less than 131 single family residential lots. In response to Plaintiffs' request to set a closing for the sale of the Undeveloped Property, Ball Homes stated, in a letter dated September 6, 2007, that its obligation to purchase the Undeveloped Property had not yet been triggered due to Plaintiffs' alleged failure to satisfy certain conditions precedent relating to the availability of sanitary sewer service. Plaintiffs claim that Ball Homes' purchase obligation was in fact triggered, and that Ball Homes wrongfully refused to close on the Undeveloped Property in breach of the terms of the Purchase Agreement.

### 2. The infrastructure improvements

The next dispute relates to certain repairs that Plaintiffs made to the developed portions of Cooper Farms following the sale to Ball Homes. Prior to 2004, Plaintiffs had developed various sections of Cooper Farms by providing the infrastructure for single family residential lots, including among other things streets, curbs, sidewalks, storm sewer facilities, domestic water and fire service, sanitary service, and street signs (the "Infrastructure Improvements"). (DN 18, § 12). As part of its duties as the developer of Cooper Farms, Plaintiffs were required

by local governmental agencies to obtain a bond to guarantee the proper installation, repair, and functioning of the Infrastructure Improvements. Plaintiffs' obligations under the bond were not released until the Infrastructure Improvements received final approval from the appropriate government agencies, and this could not occur until the subdivision was substantially completed. Thus, Plaintiffs' developer duties with respect to the maintenance of the Infrastructure Improvements survived the sale of the developed lots to Ball Homes.

Ball Homes was never made a party to the bond that Plaintiffs had secured to ensure the completion of these repairs, despite the fact that it purchased the land on which the Infrastructure Improvements had been made. As such, the Purchase Agreement specifically addressed the parties' respective duties as to any repairs that had to be made to the Infrastructure Improvements after the sale to Ball Homes:

> Seller and Buyer[3] agree that Buyer shall conduct a videotape inspection of infrastructure improvements (such as streets, curbs, sidewalks and storm sewer facilities) prior to the commencement of construction activities by Buyer on the portions of the Property acquired at the Initial and Second Closings. Buyer shall be responsible for the cost of the videotape inspection as well as any damages to such infrastructure that occur as a result of its construction activities.

(DN 24-3, § 30). In compliance with this provision, Ball Homes conducted a videotape inspection of the land prior to conducting any construction activities.

After Ball Homes came into possession of the developed lots, Plaintiffs received several notices from the Louisville Department of Public Works and Assets delineating the repairs that needed to be made to the Infrastructure Improvements before the bond would be released. Plaintiffs sent the notices, known as "punch lists," to Ball Homes with the expectation that Ball Homes would complete the repairs as requested. Ball Homes declined to complete the repairs on the grounds that some of the damage was unrelated to their construction activities on the land

---

[3] The Purchase Agreement defined "Buyer" as Ball Homes and "Seller" as Cooper Farms, LLC.

and thus was not within the scope of their contractual duty to repair. The parties were unable to resolve the issue, and, because they needed to get the bond released, Plaintiffs subsequently undertook to complete the repairs without any contribution from Ball Homes. Plaintiffs now seek to recover the cost of the repair work from Ball Homes.

### 3. The LG&E easement

As stated above, the Purchase Agreement provided for the sale of various sections of Cooper Farms over several years. In one of these phases, Ball Homes purchased lots in Section 9 that were "fully developed[,] . . . platted, [and] buildable . . . ." (DN 24-3, § 3). With respect to these developed lots, the Purchase Agreement specifically provided as a "condition precedent" to Ball Homes' obligation to close,

> Buyer shall have obtained a current boundary survey of the portion of the Property that Buyer intends to purchase which: (i) shows the boundaries thereof, (ii) certifies the exact acreage of the Property[,] (iii) shows the location of all recorded and visible easements which pertain to the Property, and (iv) meets the requirements necessary to delete a survey exception from an owner's policy of title insurance. If the survey (i) shows any encroachments affecting such Property, (ii) shows any easements which would adversely affect Buyer's intended use of such Property, or (iii) is not acceptable to Buyer's title insurance company, if any, or (iv) does not otherwise comply with any other requirement set forth in this paragraph, the Buyer shall have the option to terminate this Agreement. *However, Buyer may elect to obtain a record copy of the final subdivision plat of such portion of the Property in lieu of a boundary survey.*

(*Id.* § 4(B)) (emphasis added).

Ball Homes did not obtain a boundary survey prior to its purchase of the Section 9 lots. Instead, it elected to obtain a copy of the final subdivision plat, which Plaintiffs had retained Heritage Engineering, LLC ("Heritage") to prepare. It is undisputed that the final plat did not depict a 25-foot easement held by Louisville Gas & Electric Co. ("LG&E") that was located on several lots in Section 9, including Lot 61. Nevertheless, Heritage apparently submitted the final

plat to, and received approval from, various government agencies, including LG&E and the Louisville and Jefferson County Planning Commission.

In May 2010 Ball Homes, in apparent reliance on the final plat, commenced construction of a house on Lot 61. In November 2010, after the home was almost fully constructed, LG&E brought suit against Ball Homes in Jefferson County Circuit Court seeking damages against Ball Homes because the house on Lot 61 allegedly encroached on the easement. Ball Homes filed a third-party complaint against Plaintiffs in the state action, alleging claims for negligence, breach of contract, and indemnity. In an order entered on March 12, 2012, the Jefferson Circuit Court granted in part Plaintiffs' motion for judgment on the pleadings and dismissed Ball Homes' claims for breach of contract and indemnity. The Jefferson Circuit Court also ordered Ball Homes to remove any structures from the area on which LG&E held an easement.

**4. The Pending Motions**

Plaintiffs have filed a motion for partial summary judgment on their breach of contract claim. (DN 120). Ball Homes has also filed a cross-motion for summary judgment as to that claim, in addition to the remaining claims asserted in Plaintiffs' Third-Party Complaint. (DN 122). Finally, Plaintiffs have filed a motion for judgment on the pleadings as to Ball Homes' counterclaim seeking a declaration that Plaintiffs were the first to breach the Purchase Agreement by failing to alert Ball Homes to the existence of LG&E's easement. (DN 118).

**II.**

We will first address the parties' cross-motions for summary judgment on the claims asserted in the Third-Party Complaint. (DNs 120, 122). A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party

bears the initial burden of specifying the basis for its motion and identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). However, the nonmoving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. It must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The court, in ruling on cross-motions for summary judgment, "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

Plaintiffs have moved for partial summary judgment on Count I of the Third-Party Complaint, in which they allege that Ball Homes breached the Purchase Agreement by "failing to purchase all portions of the Property it was obligated to purchase[.]" (DN 18, ¶ 23). Ball

Homes also seeks summary judgment on Count I, in addition to the remaining counts of Plaintiffs' Third Party Complaint, which include the following: (1) breach of contract (Count I); (2) unjust enrichment (Count II); (3) contractual indemnity (Count III); (4) common law indemnification (Count IV); (5) specific performance (Count V); and (6) negligence (Count VI).[4]

**A.**

We will first address the parties' cross-motions for summary judgment on Count I of the Third-Party Complaint.[5] (DNs 120, 122). Plaintiffs allege that Ball Homes breached the Purchase Agreement when it failed to close on the Undeveloped Property despite Plaintiffs' efforts to satisfy the conditions precedent to the sale.

Pursuant to the Purchase Agreement, Ball Homes agreed to purchase the Undeveloped Property upon the satisfaction of certain conditions precedent. The condition that is at issue for the purposes of the present action is one relating to the availability of sanitary sewer to the Undeveloped Property.

> 4. **CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS**.
> The obligation of Buyer to purchase the Property and to pay the purchase prices . . . shall be subject to satisfaction of all of the following conditions precedent, as well as any other conditions precedent which may be set forth elsewhere herein . . . , and all of which Seller and Buyer shall use their best efforts to cause to be fulfilled:
>
> . . .
>
> (I)  Buyer shall have satisfied itself as to the timely availability and sufficient capacity of all utilities necessary for the development of the Property as a single-family residential subdivision, including, but not limited to, sanitary sewer . . . , which utilities will be to connection points suitable to Buyer and provided at a time that will not impede Buyer's intended development of the Property.

---

[4] Plaintiffs have agreed to voluntarily dismiss their claim for quia timet (Count VII). Accordingly, the court will dismiss this claim without any further analysis.

[5] We note that in a footnote in a responsive brief, plaintiffs DKCD, Inc., Donald J. Cook, and Deborah S. Cook seek to extricate themselves from any claim based on the Purchase Agreement that is brought by them or another party. Clearly, those plaintiffs may, in their discretion, dismiss a claim that they have brought against another party, but they do not have that same power to dismiss claims against them without a legal entitlement to do so.

(DN 24-3, § 4(I)).  In a separate provision of the Purchase Agreement, Plaintiffs represented and warranted that:

> All utilities necessary for the operation of the Property as a development of single-family residential subdivision lots are presently, or at the time each lot is purchased by Buyer will be, available to the Property, including, but not limited to, sanitary sewer . . . , all of which either enter the Property through public roads or adjoining private land in accordance with valid private or public easements for which no compensation is hereafter payable.

(*Id.* § 7(J)).  Ball Homes defends against Plaintiffs' breach of contract claim by arguing that its performance under the Purchase Agreement was excused because Plaintiffs did not satisfy either the conditions precedent or the representations and warranties regarding sewer availability.

To determine the parties' respective rights and obligations under the Purchase Agreement, we must look first to the terms of the Agreement itself.  *See Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)) (finding that under Kentucky law, "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court").  The Purchase Agreement states that Ball Homes' obligation to purchase the Undeveloped Property is conditioned upon its satisfaction with the "timely availability and sufficient capacity" of sanitary sewer to "connection points suitable to Buyer."  (DN 24-3, § 4(I)).  Thus, the issue before the court is whether sewer service was made "available" to the Property so as to trigger Ball Homes' purchase obligation.[6]

---

[6] Plaintiffs argue that because Ball Homes did not raise Plaintiffs' alleged failure to satisfy the condition precedent in Section 4(I) as an affirmative defense, Ball Homes has waived that claim under Federal Rule of Civil Procedure 8(c).  However, the Sixth Circuit recognizes that "[i]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice."  *Huss v. King Co., Inc.*, 338 F.3d 647, 652 (6th Cir. 2003) (citation omitted).  Ball Homes has come forward with evidence to show that Plaintiffs were on notice of Ball Homes' intent to assert this defense.  Plaintiffs have neither refuted these assertions nor shown how they were prejudiced by Ball Homes' failure to plead the claim as an affirmative defense.  As such, we find that Ball Homes did not waive the defense and may properly assert it.

Plaintiffs contend that they satisfied this condition when they arranged with the Louisville–Jefferson County Metropolitan Sewer District to obtain a contract for easements through McNeely Lake Park, which is a part of the Louisville Metro Park System and located in the vicinity of Cooper Farms. These easements would provide the Undeveloped Property with access to a sewer connection point through McNeely Lake Park. Pursuant to this plan, Ball Homes would have to lay sewer pipe under the land subject to the easement to connect the Undeveloped Property to the McNeely Lake Park connection point.

Plaintiffs argue that they made sanitary sewer "available" by contracting to obtain these easements of record through McNeely Lake Park. However, the Purchase Agreement does not condition Ball Homes' purchase obligation on Plaintiffs' making easements "available," but rather on its *satisfaction* with the availability of sanitary sewer to the Undeveloped Property. It is not enough that Plaintiffs provided Ball Homes with a possible method of making sewer service available. Rather, the contract terms state that Ball Homes' obligation to purchase the Undeveloped Property kicks in only once Ball Homes is satisfied as to the method by which the sewer service will be made available to the property.

It is true that Ball Homes had to act in good faith in exercising its discretion as to whether the condition was satisfied, as the covenant of good faith is implied into every contract under Kentucky law. *See Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (citations omitted). Yet Ball Homes has presented evidence that it exercised its bargained-for option to decline to go forward with the purchase in good faith. Testimony from Ball Homes' representatives establishes that they had legitimate concerns with Plaintiffs' proposed method of obtaining easements through McNeely Lake Park to make the sewer "available" to the Undeveloped Property. (Ball Dep., DN 132-1, 38:16–39:21, 75:3-15, 95:2–96:23). Specifically,

Ball Homes believed it would be difficult and costly to obtain easements through this city-owned park, and it was also concerned with "[e]nvironmental assessments, dealing with—dealing with government entity [*sic*] and, you know, people griping about disturbing a park." (*Id.* at 96:9-11).

Ball Homes' concerns in fact appear to be quite reasonable under the circumstances. Given the problems with the potential remoteness of the sewer connection and Plaintiffs' proposed path to get it to the Undeveloped Property by means of a yet-to-be-granted easement through a public park, Ball Homes was left in uncertain territory regarding an essential element of a subdivision. As such, Ball Homes acted reasonably in finding that the condition was not satisfied. Plaintiffs have not otherwise shown that Ball Homes acted in bad faith in finding the condition unsatisfied. Thus, Plaintiffs are bound by the terms of their bargain, which gave Ball Homes the discretion to decline to purchase the Undeveloped Property if it was not satisfied with the availability of the sanitary sewer service.

Ball Homes makes the argument that sanitary sewer must have been available to the Undeveloped Property by connection points to each specific lot on which Ball Homes intended to build a house. This argument evades logic; the Undeveloped Property was, as its name indicates, undeveloped, and would only be subdivided into lots after its sale to Ball Homes. However, even if Ball Homes' position regarding the connection points to the lots is questionable, Ball Homes' lack of satisfaction as to sanitary sewer availability is not unreasonable under the circumstances, given the concerns that the court previously outlined.

In sum, having found that Ball Homes' dissatisfaction with the sewer service was made in good faith, Ball Homes cannot be deemed to have breached the Purchase Agreement by refusing to purchase the Undeveloped Property. Accordingly, Ball Homes is entitled to summary judgment on Count I of the Third-Party Complaint.

**B.**

We now turn to Ball Homes' motion for summary judgment as to the remaining counts of Plaintiffs' Third-Party Complaint. (DN 122).

In Count II, Plaintiffs allege that Ball Homes was unjustly enriched because it received a 10% volume discount on the properties it purchased from Plaintiffs.[7] Plaintiffs argue that during the parties' initial negotiations, Plaintiffs orally agreed to give Ball Homes a 10% volume discount on the properties it purchased in Cooper Farms if Ball Homes agreed to purchase all of the Cooper Farms property in which Plaintiffs had an interest. This alleged term was not included in the Purchase Agreement that the parties subsequently executed. Plaintiffs nonetheless claim that they are entitled to restitution because Ball Homes failed to purchase all of the property contemplated by the Purchase Agreement and was unfairly enriched by its receipt of the volume discount, as the prices stated in the Agreement reflect the alleged discount rate.

Under Kentucky law, a claim for unjust enrichment "has no application in a situation where there is an explicit contract which has been performed." *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. 1977) (citation omitted). Plaintiffs do not deny that the Purchase Agreement governed the parties' respective rights and obligations and, although Plaintiffs contend that Ball Homes breached the Purchase Agreement when it failed to purchase the Undeveloped Property, there is no dispute that the parties substantially performed all other portions of the contract. Accordingly, Plaintiffs are barred from asserting any claim for unjust enrichment relating to the alleged volume discount. Ball Homes is entitled to summary judgment on this count.

---

[7] In their brief in response to Ball Homes' motion for summary judgment, Plaintiffs argue for the first time that the unjust enrichment claim also encompasses claims relating to the Infrastructure Improvements. (DN 133, p. 33). Plaintiffs are precluded from raising such arguments for the first time in their summary judgment brief, as the allegations in the Third-Party Complaint regarding unjust enrichment only address the alleged volume discount.

Ball Homes next seeks summary judgment on Plaintiffs' claims for contractual and common law indemnity. In Count III, Plaintiffs allege that Ball Homes is contractually obligated to indemnify Plaintiffs from any losses it incurred as a result of Ball Homes' alleged damage to the Infrastructure Improvements.[8] It appears to be undisputed that a subdivision developer remains liable for damages caused to the infrastructure that it places on the land, notwithstanding its sale of that land to a third party, and is only discharged from its responsibilities upon the release of the bond by the appropriate governmental authorities. In fact, plaintiff Donald J. Cook, the president of Cooper Farms, LLC, testified that he understood "that [Plaintiffs] would be responsible for getting [the bonds] released and that Ball Homes would be responsible for paying for the damages that they created." (DN 57-6, 71:22–72:18). Section 30[9] of the Purchase Agreement similarly contemplates that Ball Homes is "responsible for . . . any damages to such infrastructure that occur as a result of its construction activities." (DN 24-3, § 30).

Although Ball Homes admits that it received the punch list of necessary repairs from Plaintiffs, it contends that some of these damages were solely attributable to Plaintiffs and thus outside of the scope of Ball Homes' contractual responsibility to repair. In addition, Ball Homes

---

[8] In their brief in response to Ball Homes' motion for summary judgment, Plaintiffs argue for the first time that their contractual indemnity claim against Ball Homes also relates to other alleged breaches of the Purchase Agreement, including the alleged failure to purchase the Undeveloped Property. (DN 133, p. 34 n.14). Plaintiffs are precluded from raising such arguments for the first time in their brief, as the only allegations they made in Count III of the Third-Party Complaint relate to the Infrastructure Improvements.

[9] This provision must also be read in conjunction with the mutual indemnification provision in Section 8 of the Purchase Agreement, which provide as follows:

> Seller agrees to defend, indemnify and hold Buyer harmless from and against all losses, liabilities, costs and expenses (including reasonable attorney's fees) resulting from any violation or breach by Seller of any agreement, covenant, representation, or warranty made by Seller in this Agreement.
>
> Buyer agrees to defend, indemnify and hold Seller harmless from and against all losses, liabilities, costs and expenses (including reasonable attorney's fees) resulting from any violation or breach by Buyer of any agreement, covenant or representation made by Buyer in this Agreement.

(DN 24-3, § 8).

argues that its performance under the Purchase Agreement was excused because Plaintiffs completed the repairs before Ball Homes had the opportunity to visit the site and determine which damages were attributable to its construction activities.

Plaintiffs, however, have produced emails and letters that the parties exchanged at the time in question, in which Plaintiffs alerted Ball Homes to the necessity of completing the repairs in a timely manner so as to facilitate the release of the bond held by Developers. For example, in a letter dated February 4, 2010, Plaintiffs indicated that they had made several efforts to contact Ball Homes regarding the repairs and bond release issues. (DN 133-8, p. 13). Plaintiffs further stated that they were "getting extreme pressure from [Louisville] Metro Public Works" to get the repairs completed, and warned that Ball Homes could "elect to pay for and/or make the repairs yourselves, or we will complete the repairs and charge you the cost." (*Id.*). Additional correspondence between the parties in August 2011 also shows that Plaintiffs notified Ball Homes of their intent to "move forward with compliance [with the repairs identified by Public Works] and seek indemnity from Ball Homes upon completion." (*Id.* at p. 37). Plaintiffs instructed Ball Homes that if Ball Homes failed to respond to the letter, Plaintiffs would begin making the repairs within four days of Ball Homes' receipt of the letter. (*Id.*).

When viewed in the light most favorable to Plaintiffs, this correspondence suggests that Ball Homes' repair obligation was not excused by the mere fact that Plaintiffs completed the repairs before Ball Homes could determine if its activities had caused the damages. Plaintiffs provided Ball Homes with notice of their intent to hold Ball Homes responsible for the repairs, and they also gave Ball Homes an opportunity to visit Cooper Farms and determine which damages were attributable to its construction activities. This determination was made all the easier by the videotape that Ball Homes made of the property in its pre-construction condition.

Ball Homes cannot circumvent its repair obligations by claiming that its performance was excused by Plaintiffs' subsequent repair of the damaged property, especially when Plaintiffs put Ball Homes on notice of the time-sensitive nature of those repairs. Thus, Plaintiffs have raised a genuine issue of material fact as to whether Ball Homes breached Section 30 of the Purchase Agreement. Accordingly, Ball Homes is not entitled to summary judgment on Count III of the Third-Party Complaint.

In Count IV, Plaintiffs allege that Ball Homes has a common law duty to indemnify Plaintiffs for the damages caused by Ball Homes' alleged negligence with regard to the repairs of the Infrastructure Improvements. Under Kentucky law, an action for common law indemnity arises: "(1) [w]here the party claiming indemnity has not been guilty of any fault, except technically, or constructively, as where an innocent master was held to respond for the tort of his servant acting within the scope of his employment; or (2) where both parties have been in fault, but not in the same fault, towards the party injured, and the fault of the party from whom indemnity is claimed was the primary and efficient cause of the injury." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000) (quotations omitted). Thus, common law indemnity is "an equitable cause of action that is subject to particular limitations and requires a party invoking it to meet certain standards." *Electric Ins. Co. v. Freudenberg–Nok, Gen. P'ship*, 487 F. Supp. 2d 894, 903 (W.D. Ky. 2007).

Ball Homes argues that the claim for common law indemnity must fail because it seeks the same relief as Plaintiffs would be entitled to recover under their claim for contractual indemnity. However, the Federal Rules permit a party to plead claims in the alternative, "regardless of inconsistency." Fed. R. Civ. P. 8(d). Moreover, Plaintiffs contend that their contractual indemnity claim may only apply to Infrastructure Improvements that were made

before the execution of the Purchase Agreement, thus excluding a category of Infrastructure Improvements that Ball Homes installed after the sale (namely, sidewalks). Because Plaintiffs' contractual indemnity claim may not encompass certain repairs for which they seek relief, we find that Plaintiffs may plead this claim for common law indemnity in the alternative.

Ball Homes next moves for summary judgment on Count V of the Third-Party Complaint in which Plaintiffs request an order compelling Ball Homes to specifically perform its obligations under the Purchase Agreement and indemnify Plaintiffs against all damages they have incurred in repairing the Infrastructure Improvements. In their summary judgment briefings, however, Plaintiffs argue that this claim is moot because they have completed repairs to the Infrastructure Improvements, thereby making any claim against Ball Homes relating to those repairs subsumed under Plaintiffs' claim for contractual indemnity.

The court agrees that this cause of action is moot, but we must nonetheless address Ball Homes' arguments regarding Plaintiffs' ability to recover damages for any alleged breach of the covenant to repair the Infrastructure Improvements. Ball Homes argues that the Purchase Agreement provides for liquidated damages in the event of Ball Homes' breach. They contend that Section 10, entitled "Default," limits the damages to which Plaintiffs would be entitled for any breach of the Purchase Agreement.

Yet Section 10 outlines the remedies available to the parties in the event that they do not fulfill their mutual obligations to sell and purchase the property contemplated in the Purchase Agreement. Specifically, Section 10 provides as follows:

> If Seller, through no fault of Seller, is unable to convey marketable title as required by this Agreement and the defect or defects are not waived by Buyer, or if any conditions precedent to Buyer's obligations do not occur and are not waived in writing by Buyer, Seller shall promptly return the Deposit

> Payment[10], together with all interest accrued thereon, to Buyer. . . . If Seller otherwise refuses or fails to perform as required by this Agreement, Buyer may pursue specific performance.
>
> In the event of any default by Buyer hereunder, Seller's sole and exclusive remedy shall be to retain the Deposit Payment, together with all interest accrued thereon, as liquidated damages.

(DN 24-2, § 10).

It is undisputed that the parties carried out their mutual obligations to sell and purchase the property on which the Infrastructure Improvements were located. Thus, a remedy for any claim relating to the Infrastructure Improvements would not fall under Section 10, as that section only provides a remedy in the event that Plaintiffs fail to convey marketable title, or Ball Homes fails to purchase the property. Rather, Plaintiffs have appropriately sought relief under the mutual indemnification provisions of Section 8, which address each party's obligation to indemnify the other for any losses "resulting from any violation or breach by [that party] of any agreement, covenant, representation, or warranty made by [that party] in this Agreement." (*Id.* § 8). Accordingly, Plaintiffs will not be limited to the Deposit Payment as a measure of damages for Ball Homes' alleged breach of its covenant to repair the Infrastructure Improvements.

Finally, Ball Homes seeks summary judgment on Plaintiffs' negligence claim. In that claim, Plaintiffs generally allege that Ball Homes breached a "duty of reasonable and ordinary care and competence." (DN 18, § 45). Ball Homes argues that this claim fails as a matter of law because Plaintiffs have not alleged any duty Ball Homes owed to them independent of the duties it owed by virtue of their contractual relationship. The Kentucky Court of Appeals has described this so-called independent duty test in the context of a claim of negligence:

---

[10] The Deposit Payment is defined as "the sum of TEN THOUSAND DOLLARS ($10,000.00) to be paid by Buyer to Seller . . . upon Seller's acceptance of" the Purchase Agreement, whereby Plaintiffs "grant[ ] to Buyer the exclusive right to purchase the 'Initial Property' . . . and the exclusive right to purchase the 'Remainder Property[.]'" (DN 24-2, § 1).

> The failure to perform a contractual obligation typically does not give rise to a cause of action in tort. . . . However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract.

*Mims v. Western–Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007) (quoting *Jones v. Hartford Life & Accident Ins. Co.*, 443 F.Supp.2d 3, 5 (D.D.C. 2006)) (alteration in original). Because Plaintiffs have not pleaded a duty that Ball Homes owed to Plaintiffs that is independent of the duties it generally owed under the terms of the Purchase Agreement, Ball Homes is entitled to summary judgment on this count.

### III.

Ball Homes has filed a counterclaim seeking a declaration that Plaintiffs committed the first material breach of the Purchase Agreement, thereby excusing Ball Homes' performance under the Agreement. (DN 24, § 13). Ball Homes alleges that Plaintiffs breached the Purchase Agreement when they "caused the Final Plat to be recorded without depicting the LG&E Easement," despite warrantying that "the property was suitable for development subject to easements and encumbrances displayed on the Final Plat." (*Id.* §§ 10–11).

Plaintiffs have filed a motion for judgment on the pleadings as to this counterclaim. (DN 118). Ball Homes contends that the motion should be converted to one for summary judgment because it relies on matters outside of the pleadings. Because both parties have included with their briefs supplemental material not contained in the pleadings, we will treat Plaintiffs' motion as one for summary judgment.

As a preliminary matter, Plaintiffs note that the Jefferson County Circuit Court has previously addressed and partially disposed of similar claims brought by Ball Homes in a state court action. They urge the court to apply the *Colorado River* abstention doctrine and dismiss the counterclaim on policy grounds. *See Colorado River Water Conservation Dist. v. United*

*States*, 424 U.S. 800 (1976). However, the court need not reach the application of the *Colorado River* doctrine because we find that the Purchase Agreement did not place an affirmative duty on Plaintiffs to identify the LG&E easement. Such a conclusion is apparent from the language of the Purchase Agreement itself, which specifically provides that as a "condition precedent" to Ball Homes' obligation to close,

> Buyer shall have obtained a current boundary survey of the portion of the Property that Buyer intends to purchase which: (i) shows the boundaries thereof, (ii) certifies the exact acreage of the Property[,] (iii) shows the location of all recorded and visible easements which pertain to the Property, and (iv) meets the requirements necessary to delete a survey exception from an owner's policy of title insurance. If the survey (i) shows any encroachments affecting such Property, (ii) shows any easements which would adversely affect Buyer's intended use of such Property, or (iii) is not acceptable to Buyer's title insurance company, if any, or (iv) does not otherwise comply with any other requirement set forth in this paragraph, the Buyer shall have the option to terminate this Agreement. *However, Buyer may elect to obtain a record copy of the final subdivision plat of such portion of the Property in lieu of a boundary survey*.

(DN 24-3, § 4(B)) (emphasis added).

Despite the language in the Purchase Agreement stating that "Buyer shall have obtained a current boundary survey" of the Property to ensure that the property is acceptable for sale, Ball Homes opted to forego the boundary survey for the Second Closing and instead obtained a copy of the final subdivision plat that Heritage had prepared. It is undisputed that the final plat did not depict the LG&E easement. Even though Plaintiffs contracted with Heritage to complete the final plat, the Purchase Agreement did not make Plaintiffs the guarantors of the final plat's accuracy. Ball Homes cannot blame Plaintiffs for its reliance on a plat that did not depict all present easements, especially in light of the final plat's clear disclaimer that it was "subject to all roadways, easements, and rights-of-way, if any, whether shown hereon or not." (DN 118-4, p. 3 n.1). Therefore, Plaintiffs are entitled to summary judgment on Ball Homes' counterclaim.

**IV.**

For the reasons stated above, the court will grant Plaintiffs' motion for judgment on the pleadings (DN 118). Ball Homes' motion for summary judgment (DN 122) will also be granted as to Counts I, II, and VI of the Third-Party Complaint, denied as to Counts III and IV, and Counts V and VII will be dismissed as moot. Plaintiffs' motion for partial summary judgment as to Count I of the Third-Party Complaint (DN 120) will be denied. A separate order will be entered in accordance with this Memorandum Opinion.

August 6, 2014

                              **Charles R. Simpson III, Senior Judge**
                                    **United States District Court**